1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    KEVIN B. JOHNSON,                        No.  2:12-CV-2400 WBS DAD P

12              Plaintiff,

13         v.                                   FINDINGS AND RECOMMENDATIONS

14    R. ROBINSON, et al.,

15              Defendants.

16

17         Plaintiff is a state prisoner proceeding pro se in this civil rights action, brought under 42

18    U.S.C. § 1983, and is alleging violations of his civil rights.  In his complaint, plaintiff has

19    presented numerous claims, all of which center on prison officials' decision in 2009 to include an

20    "R-suffix" in his custody classification.  The California Department of Corrections and

21    Rehabilitation (CDCR) uses the R-suffix to indicate an inmate is a sex offender, a classification

22    that in turn affects an inmate's eligibility for certain custody assignments.  Plaintiff alleges that

23    adding the R-suffix to his custody classification violated his rights to due process and equal

24    protection.  He further alleges that the defendants recommended or assigned him the R-suffix in

25    retaliation for his filing of inmate grievances in the past and that the placement of the R-suffix in

26    his classification violates his right to be free from cruel and unusual punishment under the Eighth

27    Amendment.  Plaintiff also avers state law causes of action for fraud, intentional infliction of

28    emotional distress and negligence.

1

1    Pending before the court now are several motions to dismiss and one motion for summary

2    judgment filed on behalf of the various defendants.

3    I.   Factual background

4    In his complaint, plaintiff alleges as follows.  Plaintiff's criminal history begins in 1977,

5    when he pled guilty to one misdemeanor count of indecent exposure, a violation of California

6    Penal Code § 314.1.  (Complaint (Doc. No. 1) at ¶ 19.)  Plaintiff claims that he "is not now, nor

7    has he ever been, required to register per [Penal Code Section] 290 for that 1977 conviction."  (Id.

8    at ¶ 21.)  Section 290 of the California Penal Code establishes the state's sex offender registration

9    requirement for individuals convicted of certain sex offenses.  California Code of Regulations,

10   title 15, section 3377.1(b)(1)(A) (2008), states that "[a]n 'R' suffix shall be affixed to an inmate's

11   custody designation . . . during reception center processing if . . . [t]he inmate is required to

12   register per PC Section 290."   The R-suffix is relevant to determining an inmate's housing

13   assignment and the degree of supervision he will require while in CDCR's custody.  See 15 CCR

14   § 3377.1(a).

15   Plaintiff states he entered California's correctional system in 1981 on a narcotics

16   conviction.  (Complaint at ¶ 21.)  Plaintiff bounced in and out of CDCR's custody until 2000,

17   when he was given a life sentence under California's Three-Strike provision.  (Id. at ¶¶ 37-56; see

18   also Ex. D.)  It does not appear that plaintiff was convicted of any sex offense other than the

19   misdemeanor indecent exposure charge in 1977.  However, in 1999, while in CDCR's custody,

20   "plaintiff was forced to submit [to] the felony statutory provision found in P.C. 296 et seq. for his

21   misdemeanor offense."  (Id. at ¶ 48.)  Here, plaintiff refers to the sections of the California Penal

22   Code that require CDCR officials to collect DNA samples from inmates who have been convicted

23   of certain offenses.  See Cal. Penal Code §§ 295-296.  In his complaint he says that "as a direct

24   result of this erroneous DNA collection, a [Folsom State Prison] classification committee

25   erroneously affixed an 'R' suffix to the plaintiff's custody designation[,] labeling him a 'sex

26   offender' without conducting any 'R' suffix evaluation."  (Compl. at ¶ 49.)  Plaintiff appealed the

27   R-suffix designation through CDCR's internal grievance process and requested clarification as to

28   whether he was required to register as a sex offender under Penal Code § 290. (See Compl. Ex.

B.)  A Correctional Case Supervisor responded to his appeal as follows:

> After a thorough review of your Rap Sheet, I did discovered [sic] an arrest of Aug. 14, 1976 by Sacramento Co. for 314.1 PC/Indecent Exposure (Misdemeanor).  On Feb. 3, 1977, you were convicted of that particular offense.
>
> However, per People vs. King (1984) 157 Cal.3d 554 Court of Appeals, Fourth Appellate Dist. Court, conviction of this offense is no longer registrable [sic] if the offense was committed on or before June 22, 1984, or unless ordered by the court.
>
> Contact was made with the Department of Justice (Registration Unit) in Sacramento to determine if the court had ever ordered you to register per 290 PC. . . .  [N]o registration is required. A Notation has been entered in your Central File to that affect [sic]. All existing forms will be purged from the Central File, and a copy of this appeal will remain in the file, as a point of reference.

Id.  According to plaintiff, his inmate appeal resulted in having the R-suffix removed from his classification status.  (Compl. at ¶¶ 51-53.)

In December 2008, prison officials at Corcoran State Prison, however, revisited plaintiff's custody classification.  (Id. at ¶ 61.)  Plaintiff had requested a transfer to a lower-security institution, and a classification staff representative was required to evaluate his custody designation prior to endorsing or opposing the transfer.  (Id. at ¶¶ 62-65.)  As part of that process, a unit classification committee (UCC) decided not to affix the R-suffix to plaintiff's custody classification because no documentation regarding his arrest and conviction for misdemeanor indecent exposure was available.  (Id. at ¶ 66; Compl., Ex. G.)  On January 20, 2009, plaintiff was transferred to California Training Facility (CTF).  (Id. at ¶ 68.)

Defendant Robinson was assigned as plaintiff's correctional counselor (CCI) upon plaintiff's arrival at CTF.  (Compl. at ¶ 70.)  According to plaintiff, he and Robinson had a negative history:  Robinson had been plaintiff's CCI during plaintiff's previous stint at CTF from 2005 to 2007.  (Id. at ¶ 75.)  In October or November 2006, plaintiff "lodged an administrative grievance / staff complaint against defendant R. Robinson for what plaintiff alleged was 'a morally lax character when dealing with inmates and applying prison policy.'"  (Id. at ¶ 76.) "Plaintiff's return to CTF on Jan. 20, 2009, was his first encounter with defendant R. Robinson in over two years."  (Id. at ¶ 77.)

According to plaintiff, during a meeting in Robinson's office on January 27, 2009, Robinson informed plaintiff that at an upcoming initial classification committee hearing he would recommend applying an R-suffix to plaintiff's custody classification in light of his conviction for misdemeanor indecent exposure in 1977.  (Id. at ¶ 71.)  Plaintiff informed Robinson that the UCC at Corcoran had just decided against affixing the R-suffix to plaintiff's classification.  (Id. at ¶ 81.)  "Defendant R. Robinson stated that he was, indeed, aware of that fact."  (Id. at ¶ 82.) Plaintiff alleges that he continued to press Robinson that reconsideration of his classification was unnecessary, whereupon "Defendant R. Robinson . . . showed plaintiff the door, stating, '[I]f you don't like it, appeal it, or file one of your little complaints, you like to do that – right.'"  (Id. at ¶ 86.)

Plaintiff appeared before a "mock" classification committee on February 4, 2009.[1] (Compl. at ¶ 69.)  The committee was comprised of defendants Robinson and King and non-party correctional officer Todd.  (Id. at ¶ 89.)  King presided as "acting captain."  (Id. at ¶ 90.) Defendant Robinson formally recommended affixing the R-suffix in light of plaintiff's misdemeanor indecent exposure conviction.   (Id. at ¶ 91.)  Plaintiff alleges that "[d]efendant King then abruptly attempted to conclude [the hearing] by telling plaintiff that was all and he could go[,]" but plaintiff "began to address his disagreement . . . directing defendant King to the Dec. 4, 2008 [hearing] where the issue of the 'R' suffix . . . had just been fully and exhaustively evaluated and resolved[.]"  (Id. at ¶¶ 92-93.)  King replied that Robinson had already reviewed that part of plaintiff's record and determined that affixing the R-suffix was appropriate.  (Id. at ¶ 94.)  Plaintiff claims that when he "attempted to ask on what grounds had defendant Robinson made that 'determination,' defendant R. Robinson interrupted plaintiff by standing and saying, 'We're done here, let's go.'"  (Id. at ¶ 95.)  The complaint further alleges that when he asked if he could submit a letter explaining his opposition to the R-suffix, and when defendant King "responded affirmatively and began to reach across the table top" to take the letter, Robinson

---

[1] The term "mock" appears to be plaintiff's characterization of the committee, reflecting his contention that the committee was not properly formed under CDCR regulations and had no authority to recommend the R-suffix.  (See Compl. at ¶¶ 88-89, 113-17.)

1   "became livi[d] and very angry[,] placed his hand on his pepper-spray and stepped toward

2   plaintiff, who was still seated, as if he was going to spray plaintiff right in the face."  (<u>Id.</u> at ¶

3   102-05.)  Plaintiff avers that "[d]efendant King then jumped from her chair yelling, 'Robinson,

4   stop it.  Sit down!'"  (<u>Id.</u> at ¶ 106.)  King informed plaintiff that the committee's decision was

5   "only a recommendation" to be submitted to a classification staff representative (CSR).  (<u>Id.</u> at ¶

6   108.)  King allegedly went on to tell plaintiff that "if the CSR does go along with our

7   recommendation today, then I will personally provide you with the CDC Form 840 and the CDC

8   Form 128G recording today's committee decision so you can appeal this action if that's what you

9   want to do, but you must wait for the proper forms . . . so you can attach them to your appeal[.]"

10   (<u>Id.</u>)  The record of the February 4 hearing states that "[t]he inmate was told . . . that he can argue

11   his case through a CDCR 602 Appeal process if the CSR approves today's committee action and

12   receives copies of the CDCR 128-G and CDCR 840 forms."[2]  (Compl., Ex. HH.)

13          Plaintiff states as he exited the hearing room on February 4, he "made a conscious

14   decision right there and then to stay as far away from defendant R. Robinson as possible."

15   (Compl. at ¶ 118.)

16          It appears that defendant Donnelly, the CSR assigned to plaintiff's classification after the

17   initial hearing, approved the R-suffix recommendation on February 17, 2009, though the form

18   recording that decision simply states that the "R suffix is noted." (Compl., Ex. I I.)  The form

19   documenting the CSR's review is labeled "CDC 128-G," which is one of the forms plaintiff had

20   to wait for before filing an appeal.  (<u>Id.</u>)  However, plaintiff maintains that he received no notice

21   of any final decision on his custody classification for over a year after the hearing of February 4,

22   2009.  He states that he sent defendant King notes "several times during the months that followed

23   . . . inquiring about the status of his custody . . . but never received any reply."  (<u>Id.</u> at ¶ 122.)

24   _____

25   [2]  The record of the February 4 hearing lists defendant Jordan as the committee chairperson.
     (Compl., Ex. HH.)  There is a signature above Jordan's name.  Plaintiff insists Jordan was not at
26   the February 4 hearing and alleges that Jordan, Robinson and King have fraudulently represented
     that Jordan was there by signing their names on the record.  (Compl. at ¶337, 340-41.)  The court
27   notes that the document also lists correctional officers Moffatt and Lacy as committee members.
     Neither of them is a defendant in this lawsuit, nor is Officer Todd, who no one disputes was at the
28   hearing.

1  Plaintiff was transferred to Folsom State Prison (FSP) in July 2010.  (Id. at ¶ 120.)  He alleges

2  that during his entire stay at CTF, he never heard that an R-suffix had been affixed to his custody

3  status.  (Id. at ¶ 124.)

4       According to the complaint, "[i]t wasn't until plaintiff's initial classification committee at

5  FSP on July 21, 2010 that plaintiff learned that he did, indeed, have an 'R' suffix affixed to his

6  custody designation dating back to the Feb. 4, 2009 UCC [hearing] at CTF." (Id. at ¶ 125.)

7  Plaintiff again argued his case at FSP that the change in his classification was an error and

8  violated CDCR regulations.  (Id. at ¶ 129.)  Defendant Jacquez, who chaired the UCC that day,

9  replied simply that the R-suffix was valid.  (Id. at ¶ 131.)  Plaintiff filed an administrative appeal

10  of the R-suffix that same day, July 21, 2010.  (See Compl., Ex. J.)  It was the first inmate appeal

11  related to his new custody classification.

12       Plaintiff's appeal was screened out by defendant Fransham initially because it did not

13  include the proper documentation.  (Compl. at ¶ 139.)  Ultimately Fransham rejected plaintiff's

14  inmate appeal as untimely.  (Id. at ¶¶ 167, 169.)  After extensive interaction with Fransham and

15  plaintiff's correctional counselor at Folsom, defendant Pulley, "plaintiff felt, at this point, that he

16  had no choice but to wait for the next annual classification review committee."  (Id. at ¶ 219.)

17       Defendants Wilkinson, Marton and Pulley were present at plaintiff's next classification

18  hearing, in December 2011.  (Compl. at ¶¶ 228-29.)  Plaintiff again argued at that time against the

19  affixing of the R-suffix to his classification, but Wilkinson informed him that the committee

20  would not take up the issue.  (Id. at ¶¶ 233-34.)  As plaintiff continued to argue his case,

21  defendant Pulley allegedly "shoved" plaintiff out of the room.  (Id. at ¶¶ 237-39.)  Plaintiff

22  appealed again.  Defendant Olstrom screened out the inmate appeal as untimely.  (Compl., Ex.

23  GG.)  At a meeting with defendant Olstrom to discuss his inmate appeal's "cancellation,"

24  Olstrom gave plaintiff copies of the 128-G form for the hearing of February 4, 2009, at which

25  Robinson had originally recommended the R-suffix, and the 128-G form reflecting the CSR's

26  apparent approval of that recommendation on February 17, 2009.  (Compl. at ¶¶ 259-61.)

27  According to plaintiff, that was the first time plaintiff had received those forms.  (Id. at ¶¶ 262.)

28  /////

1      II.   The question of plaintiff's registration requirement under Penal Code § 290

2           One of plaintiff's key allegations is that his misdemeanor conviction for indecent

3   exposure in 1977 has never required him to register as a sex offender under California Penal Code

4   § 290.  The undersigned's own inquiry indicates that contention to be false:  in fact, a conviction

5   for indecent exposure has long been included in the text of § 290 as a sex offense that triggers the

6   statute's mandatory reporting requirement.  This appears to have been the case since at least 1970.

7   See, e.g., Barrows v. Municipal Court, 1 Cal.3d 821, 826 (1970) ("Among the persons who are

8   required to register pursuant to section 290 are those who are convicted of ... exposing one's

9   person in a public place (§314)[.]")  Although there was a long period after plaintiff's conviction

10  during which California courts questioned the constitutionality of including indecent exposure as

11  an offense requiring registration under § 290, this court can find no indication that the

12  requirement was not in effect when plaintiff pled guilty to indecent exposure in 1977.[3]

13  _____

14  [3]  In 1983, the California Supreme Court held that requiring one convicted of misdemeanor "lewd or dissolute conduct" (California Penal Code § 647(a)), to register as a sex offender was a form of

15  punishment that violated the California constitution's ban on cruel and unusual punishment (Cal. Const., art. I, § 17).  In re Reed, 33 Cal.3d 914 (1983).  In 1984, the California Court of Appeal

16  relied on the decision in Reed to hold that "the continuing penalty of sex offender registration is out of all proportion to the crime of misdemeanor indecent exposure."  In re King, 157 Cal. App.

17  3d 554, 558 (1984).  CDCR's 1999 memorandum informing plaintiff that the R-suffix would be removed his classification cited King as the legal basis for that administrative decision.  (Compl.,

18  Ex. B.)  The California Supreme Court never squarely addressed the intermediate court's ruling in King or the status of indecent exposure under § 290 and Reed.  In 2004, however, the California

19  Supreme Court expressly overruled Reed.  In In re Alva, 33 Cal.4th  254 (2004), the court held that "California's law requiring the mere registration of convicted sex offenders is not a punitive

20  measure subject to either state or federal proscriptions against punishment that is 'cruel' and/or 'unusual.'"  Alva, 33 Cal. 4th at 262.  The petitioner in Alva had been convicted of misdemeanor

21  possession of child pornography.  As before, the California Supreme Court offered no explicit extension of the new ruling to convictions for misdemeanor indecent exposure.  Six months later,

22  though, the same intermediate appellate court that had applied Reed's ban to a conviction for misdemeanor indecent exposure in King abrogated that ruling, concluding that Alva's analysis

23  "applies with equal force to any of the misdemeanor crimes listed in section 290, subdivision (a)(2)(A)."  In re Noriega, 124 Cal. App.4th 1334, 1342 (2004) (emphasis added).  Thus King is

24  no longer good law.  Like the plaintiff in this case, the defendant in Noriega had been convicted of misdemeanor indecent exposure.  The decision in Noriega required that defendant to register as

25  a sex offender under § 290.  This court's survey of California law uncovers no ruling inconsistent with Noriega's holding.  The undersigned concludes, therefore, that after an ambiguous reprieve

26  starting in 1984, plaintiff fell under the registration requirement of §290 again in 2004 and has remained there ever since.

27

28

1   IV.   Defendant Robinson's summary judgment motion for failure to exhaust

2   Defendant Robinson initially filed a single motion to dismiss under Rule 12, arguing:  (1)

3   plaintiff has failed to exhaust his administrative remedies prior to filing suit as required; (2)

4   plaintiff has failed to state any federal claim on which relief could be granted; (3) plaintiff has

5   failed to plead any viable state law claims; and (4) defendant Robinson is entitled to qualified

6   immunity.  (See Doc. No. 43.)  Two weeks prior to Robinson's filing his motion to dismiss,

7   however, the Ninth Circuit decided Albino v. Baca, 747 F.3d 1162, 1168-77 (9th Cir. 2014),

8   holding that in most cases the appropriate procedural device for arguing failure to exhaust

9   administrative remedies as a basis for dismissal is a motion for summary judgment under Federal

10  Rule of Civil Procedure 56.  On June 3, 2014, this court, relying on Albino, denied Robinson's

11  motion to dismiss in part and without prejudice and gave him thirty days in which to re-file his

12  exhaustion argument via a motion for summary judgment.  (See Doc. No. 52.)  Defendant

13  Robinson complied with that order, and plaintiff timely filed his oppositions to the defendant's

14  motions.  (See Docs. 53, 56.)

15  By the Prison Litigation Reform Act of 1995 (PLRA), Congress amended 42 U.S.C. §

16  1997e to provide that "[n]o action shall be brought with respect to prison conditions under section

17  1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other

18  correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C.

19  § 1997e(a).  The exhaustion requirement "applies to all inmate suits about prison life, whether

20  they involve general circumstances or particular episodes, and whether they allege excessive

21  force or some other wrong."  Porter v. Nussle, 534 U.S. 516, 532 (2002).

22  The United States Supreme Court has ruled that exhaustion of prison administrative

23  procedures is mandatory regardless of the types of degrees of relief a state's correctional system

24  offers.  See Booth v. Churner, 532 U.S. 731, 741 (2001).  The Supreme Court has further

25  cautioned against reading futility or other exceptions into the statutory exhaustion requirement.

26  See id. at 741 n.6.  Moreover, because proper exhaustion is necessary, a prisoner cannot satisfy

27  the exhaustion requirement by filing an untimely or otherwise procedurally defective

28  administrative grievance or appeal.  See Woodford v. Ngo, 548 U.S. 81, 90-93 (2006).  "[T]o

8

1   properly exhaust administrative remedies prisoners 'must complete the administrative review

2   process in accordance with the applicable procedural rules,' [ ] – rules that are defined not by the

3   PLRA, but by the prison grievance process itself."  Jones v. Bock, 549 U.S. 199, 218 (2007)

4   (quoting Woodford, 548 U.S. at 88).  See also Marella v. Terhune, 568 F.3d 1024, 1027 (9th Cir.

5   2009) ("The California prison system's requirements 'define the boundaries of proper

6   exhaustion.'").

7        A court may excuse a prisoner from complying with the PLRA's exhaustion requirement

8   if he establishes that the existing administrative remedies were effectively unavailable to him.

9   See Albino, 747 F.3d at 1172-73.  For example, where prison officials improperly screen out

10  inmate grievances, they can render administrative remedies effectively unavailable.  See Sapp v.

11  Kimbrell, 623 F.3d 813, 823 (9th Cir. 2010).  In such a case, "the inmate cannot pursue the

12  necessary sequence of appeals . . . ."  Id.  See also Nunez v. Duncan, 591 F.3d 1217, 1226 (9th

13  Cir. 2010) (excusing an inmate's failure to exhaust because he was precluded from exhausting his

14  administrative remedies by a warden's mistaken instruction to him that a particular unavailable

15  document was needed for him to pursue his inmate appeal); Marella, 568 F.3d 1024 (excusing an

16  inmate's failure to exhaust because he did not have access to the necessary grievance forms to

17  timely file his grievance).

18        The PLRA exhaustion requirement is not jurisdictional; it creates an affirmative defense

19  that defendants must plead and prove.  See Jones, 549 U.S. at 216 ("[I]nmates are not required to

20  specially plead or demonstrate exhaustion in their complaints."); Albino, 747 F.3d at 1168.  A

21  defendant may move for dismissal under Federal Rule of Civil Procedure 12(b)(6) "[i]n the rare

22  event" that a prisoner's failure to exhaust is clear on the face of the complaint.  Albino, 747 F.3d

23  at 1168-69.  Otherwise defendants must move for summary judgment under Federal Rule of Civil

24  Procedure 56 and produce probative evidence that proves a prisoner's failure to exhaust.  See id.

25  at 1166.  Specifically, "the defendant's burden is to prove that there was an available

26  administrative remedy, and that the prisoner did not exhaust that available remedy."  Id. at 1172.

27  If the defendant carries that burden, "the prisoner has the burden of production.  That is, the

28  burden shifts to the prisoner to come forward with evidence showing that there is something in

9

1    his particular case that made the existing and generally available administrative remedies

2    effectively unavailable to him." Id. If the undisputed evidence viewed in the light most favorable

3    to the prisoner demonstrates a failure to exhaust, the court should grant defendant's motion for

4    summary judgment. Id. at 1166. On the other hand, if there are material facts in dispute, the

5    court should deny defendant's motion summary judgment. Id.

6         In California, prisoners may appeal "any policy, decision, action, condition, or omission

7    by the department or its staff that the inmate or parolee can demonstrate as having a material

8    adverse effect upon his or her health, safety, or welfare." Cal. Code Regs. tit. 15, § 3084.1(a).

9    Prior to January 28, 2011,

10               California's Department of Corrections provide[d] a four-step
                 grievance process for prisoners who seek review of an
11               administrative decision or perceived mistreatment. Within fifteen
                 working days of "the event or decision being appealed," the inmate
12               . . . ordinarily [was to] file an "informal" appeal, through which
                 "the appellant and staff involved in the action or decision attempt to
13               resolve the grievance informally." Cal. Code Regs., tit. 15, §§
                 3084.5(a), 3084.6(c) (2009). [Footnote omitted.] If the issue [was]
14               not resolved during the informal appeal, the grievant next
                 proceed[ed] to the first formal appeal level, usually conducted by
15               the prison's Appeals Coordinator. Id. §§ 3084.5(b), 3084.6(c).
                 Next [was] the second level, providing review by the institution's
16               head or a regional parole administrator, and the third level, in which
                 review is conducted by a designee of the Director of the
17               Department of Corrections. [Footnote omitted.] Id. § 3084.5(e)(1)-
                 (2).
18

19   Brown v. Valoff, 422 F.3d 926, 929-30 (9th Cir. 2005).[4]

20        In this case, it is not disputed that plaintiff did not file any inmate grievance concerning

21   the classification process in his case until July 21, 2010, the same day he learned from the initial

22   classification committee at Folsom that the R-suffix had been attached to his status. Defendant

23

24   ─────────────────
     [4]  CDCR regulations governing the grievance and appeals process underwent significant
25   modifications that became effective January 28, 2011. One of those changes extended the time
     limit for filing an initial grievance from fifteen days to thirty days; that regulation was relisted
26   from § 3084.6(c) (2009) to § 3084.8(b). See Garland v. Lewis, No. CV 10-9010 FMO (OPx),
     2013 WL 4198278 at *7 (C.D. Cal. Aug. 12, 2013). Defendant Robinson erroneously cites the
27   thirty-day limit as applicable here. However, all relevant facts concerning exhaustion in this case
     occurred in 2009 and 2010, prior to the date these amendments became effective. Accordingly,
28   the pre-amendment fifteen-day window is the applicable time period in this case.

                                             10

1    Robinson argues that plaintiff was on notice of the R-suffix no later than February 4, 2009, the

2    date of the initial classification committee's hearing at CTF, and that the administrative appeal

3    plaintiff filed in July 2010 was therefore too late to exhaust any claims against him.  Plaintiff

4    responds that since he did not know that the R-suffix was attached to his classification status until

5    July 21, 2010, he could not have filed a grievance against Robinson before that date.

6                        1.  Exhaustion of the retaliation claim against Robinson

7              The court takes plaintiff's allegation that he did not learn about the R-suffix until his

8    transfer to Folsom in July 2010 to be true.  However, that allegation would not have been relevant

9    to an inmate grievance based on defendant Robinson's alleged conduct at his meeting with

10   plaintiff on January 27, 2009, and at the hearing of February 4, 2009, where the re-classification

11   process began.  Of the numerous federal claims plaintiff has levied against defendant Robinson,

12   only the claim for retaliation arises purely from plaintiff's allegations concerning Robinson's

13   conduct.  It is therefore the only claim that is not arguably dependent on the final outcome of the

14   February 4, 2009 hearing, i.e., the decision to give plaintiff the R-suffix.[5]

15             According to plaintiff's own version of events, defendant Robinson's conduct in January

16   and February 2009 made it apparent to him that Robinson was acting out of a retaliatory motive

17   in recommending the R-suffix be affixed to his custody classification.  Insofar as the complaint

18   does not allege Robinson took any further action against plaintiff after the hearing of February 4,

19   2009, the fact that plaintiff did not learn about the final decision on the R-suffix until July 2010 is

20   irrelevant to plaintiff's failure to file an inmate grievance with respect to Robinson's alleged acts

21   of retaliation when plaintiff became aware of those acts.  There is no question plaintiff understood

22   that the classification committee at CTF had convened to discuss whether to recommend affixing

23   the R-suffix to his custody classification.  Moreover, there is no dispute plaintiff understood

24   _____

25   [5]  If, for example, plaintiff alleged that defendant Robinson used excessive force against him at
     the February 4 hearing, a grievance for that conduct obviously would have accrued right then,
26   regardless of the outcome of the hearing.  Likewise, a grievance based on Robinson's alleged
     retaliation against plaintiff accrued when plaintiff became aware of Robinson's alleged
27   motivation to retaliate through the classification process regardless of whether Robinson was
     successful in recommending the R-suffix or when plaintiff finally found out about Robinson's
28   success in actually getting the suffix affixed.

                                                    11

1   Robinson's role in the classification process was limited to making a recommendation on

2   February 4 to affix the R-suffix to plaintiff's custody status.  Defendant Robinson did not have

3   authority to do more than make his recommendation that day; plaintiff himself is adamant that the

4   final decision was for another officer to make.  Plaintiff is just as adamant that he had come to

5   believe defendant Robinson was acting out of hostility toward him by the time the hearing of

6   February 4 was over.  Indeed, plaintiff claims that as he left that hearing, he "made a conscious

7   decision right there and then to stay as far away from defendant R. Robinson as possible."

8   (Complaint, ¶ 118.)  Yet plaintiff offers nothing as to why he did not file an inmate grievance

9   against defendant Robinson for retaliation or any other wrongful conduct within fifteen days of

10  the hearing.

11          Plaintiff suspected or had good reason to suspect no later than February 4, 2009, that

12  Robinson was carrying out some kind of retaliation against him through the classification process.

13  Therefore any claim based on allegations of retaliation against Robinson, or any other claim

14  based on Robinson's conduct or presence at the 2009 hearing, is unexhausted due to plaintiff's

15  failure to pursue a timely inmate appeal with respect to that conduct.

16                  2.  Plaintiff's failure to alert officials to Robinson's alleged conduct

17          An inmate appeal not only must be timely in order to exhaust a future claim presented in a

18  civil action, it must also provide the factual detail required by prison regulations so that prison

19  officials have notice of the nature of the prisoner's complaint.  As a general matter, the level of

20  specificity necessary to exhaust a claim in a prison appeal is not very high:

21              A grievance need not include legal terminology or legal theories
                unless they are in some way needed to provide notice of the harm
22              being grieved.   A grievance also need not contain every fact
                necessary to prove each element of an eventual legal claim.   The
23              primary purpose of a grievance is to alert the prison to a problem
                and facilitate its resolution, not to lay the groundwork for litigation.
24

25  Griffin v. Arpaio, 557 F.3d 1117, 1120 (9th Cir. 2009).  See also Morton v. Hall, 599 F.3d 942,

26  946 (9th Cir. 2010) (applying Griffin to CDCR regulations governing prison grievances).  Where

27  a prisoner's inmate appeal "does not . . . challenge the plaintiff's [classification] based on alleged

28  retaliatory conduct[,]" a § 1983 claim for retaliation is unexhausted.  Dixon v. LaRosa, No. 2:10-

                                                       12

1    cv-1441 GEB KJN P, 2011 WL 3875806 at *11 (E.D. Cal. Aug. 31, 2011).  If "[p]laintiff's

2    appeal . . . clearly complains about denial of due process rights but not retaliation," the claim for

3    retaliation is unexhausted.  Goolsby v. Gonzalez, No. 1:11-cv-0394-LJO-GSA-PC, 2014 WL

4    7272765 at *13 (E.D. Cal. Dec. 18, 2014).

5         Here, plaintiff's inmate appeal regarding his receiving of the R-suffix complained that

6    there was no evidence to support the R-suffix and that it was affixed to his classification status

7    without due process and contrary to CDCR regulations.  (See Complaint, Ex. J.)  Those

8    allegations do nothing to apprise prison officials of the retaliatory conduct plaintiff would later

9    allege against defendant Robinson in this lawsuit.  Plaintiff made no mention of Robinson in the

10   appeal, did not reference the February 4, 2009 hearing at CTF, and did not describe any action

11   suggesting that a prison official had retaliated against plaintiff in any way.  See Goolsby, 2014

12   WL 7272765 at *13 ("Plaintiff was not required to name all the defendants, state legal theories, or

13   use the word 'retaliation,' but the language of the written appeals, without more, did not address

14   Plaintiff's retaliation claim.").

15        In fact, plaintiff's use of the inmate grievance process in 2010 could not have alerted a

16   CDCR official to the possibility that he was complaining about any wrongful conduct or decision

17   for which defendant Robinson was responsible.  Plaintiff's inmate appeal specifically attacked the

18   decision of Folsom's classification committee to keep the R-suffix in place; it does not mention

19   anything that allegedly happened at CTF, where defendant Robinson first recommended the

20   affixing of the R-suffix to plaintiff's classification in February 2009.  (See Complaint, Ex. J.)

21   The fact that plaintiff challenged the R-suffix as soon as he learned about its imposition in July

22   2010 does not exhaust every related, alleged wrong that plaintiff believes occurred in the inmate

23   classification process going back to early 2009, alleged wrongs of which plaintiff was clearly

24   aware when they occurred.  "Where one set of facts and circumstances gives rise to more than

25   one potential claim, the plaintiff cannot exhaust all of the potential claims by merely exhausting

26   one such claim."  Johnson v. Woodford, No. CV 04-05995-GHK (CT), 2010 WL 4007308 at *4

27   (C.D. Cal. Apr. 20, 2010) (relying on the decision in Morton).  See also Escobar v. Smith, No.

28   2:12-cv-0773 GEB DAD P, 2012 WL 5465889 at *4 (E.D. Cal. Nov. 7, 2012) (stating that

1   although the inmate complained to prison officials about being deprived of medication, his

2   grievance "did not give prison officials a fair opportunity to respond to a complaint that he was

3   being wrongfully deprived of surgery").

4          Plaintiff cannot plausibly show that his use of the inmate grievance process in 2010 put

5   prison officials on notice about any complaint that could be imputed to defendant Robinson.  As a

6   result, all of plaintiff's claims against defendant Robinson were unexhausted at the time this civil

7   action was filed.  Accordingly, defendant Robinson's motion for summary judgment for failure to

8   exhaust prior to filing suit should be granted thereby rendering defendant Robinson's motion to

9   dismiss the claims against him under Rule 12(b)(6) moot.

10          IV.   Motions to dismiss under Rule 12(b)(6)

11          Defendants Jordan, Marton, Pulley, Ostrom, Donnelly, Fransham, Jacquez and Wilkinson[6]

12   have jointly filed a motion seeking dismissal of all of plaintiff's claims under Federal Rule of

13   Civil Procedure 12(b)(6), for failure to state a claim on which relief could be granted.  Defendant

14   Robinson has filed a separate motion dismiss on the same ground, but as stated above, it will be

15   rendered if the undersigned's recommendation that his motion for summary judgment due to

16   plaintiff's failure to exhaust prior to filing suit be granted is adopted.   Nevertheless, the court will

17   also analyze the viability of plaintiff's claims against defendant Robinson under Rule 12(b)(6).

18   Finally, defendant King has also filed a separate motion to dismiss under Rule 12(b)(6).[7]

19          In considering a motion under Rule 12(b)(6), the court must accept the allegations of the

20   complaint as true, Erickson v. Pardus, 551 U.S. 89, 94 (2007), and construe the complaint in the

21   light most favorable to the plaintiff.  See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).  Pro se

22   pleadings are held to a less stringent standard than those drafted by lawyers.  See Haines v.

23

24   [6]  The court refers occasionally to these defendants as "the joint defendants" or "jointly moving

25   defendants."

26   [7]  Defendant King's argument in support of her motion to dismiss appears to be cut-and-pasted

27   verbatim from the memorandum submitted by the jointly moving defendants.  (Doc. No. 37 at 8-30.)  Not even the names of the joint defendants are changed to "defendant King" where it would

28   be appropriate.  Needless to say, the arguments presented in such a fashion by counsel for defendant King are unhelpful.

1   Kerner, 404 U.S. 519, 520 (1972).  Still, to survive dismissal for failure to state a claim, a pro se

2   complaint must contain more than "naked assertions," "labels and conclusions" or "a formulaic

3   recitation of the elements of a cause of action."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544,

4   555-57 (2007).  "Threadbare recitals of the elements of a cause of action, supported by mere

5   conclusory statements do not suffice."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  Furthermore,

6   a claim upon which the court can grant relief must have facial plausibility.  Twombly, 550 U.S. at

7   570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the

8   court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

9   Iqbal, 556 U.S. at 678.  Attachments to a complaint are considered to be part of the complaint for

10  purposes of a motion to dismiss for failure to state a claim.  Hal Roach Studios v. Richard Feiner

11  & Co., 896 F.2d 1542, 1555 n.19 (9th Cir.1990).

12              A.   Plaintiff's due process claims

13              Plaintiff contends that defendants Robinson, King and Jordan violated his right to due

14  process in recommending the R-suffix be attached to his classification status at the hearing held at

15  CTF on February 4, 2009.  (Compl. at ¶ 443.)  Again, according to plaintiff, King and Robinson

16  attended the hearing (along with non-party Todd), while Jordan merely signed the 128-G form

17  memorializing the recommendation.  Plaintiff alleges defendant Donnelly also violated his right

18  to due process by approving the recommendation.  (Id. at ¶ 448.)  Plaintiff alleges defendant

19  Jacquez violated his right to due process in failing to remove the R-suffix once he arrived at

20  Folsom in July 2010.  (Id. at ¶¶ 450-53.)  He also alleges defendants Wilkinson, Pulley and

21  Marton violated his right to due process in the UCC hearing of December 2011. (Id. at ¶¶ 464,

22  467.)  Plaintiff claims that defendants Fransham, Pulley and Ostrom deprived him of due process

23  in their handling of his inmate appeals before and after the UCC hearing of December 2011.  (Id.

24  at ¶¶ 456, 460-61, 470, 472.)

25              A liberty interest that requires the protections of due process arises from one of two

26  sources:  the Due Process Clause of the Fourteenth Amendment or state law.  Wilkinson v.

27  Austin, 545 U.S. 209, 222 (2005).  Prisoners have no freestanding right under the Fourteenth

28  Amendment to any particular security classification.  See Neal v. Shimoda, 131 F.3d 818, 828

15

1   (9th Cir.1997) (citing Moody v. Daggett, 429 U.S. 78, 88 n. 9 (1976)).  Therefore any liberty

2   interest plaintiff had in avoiding the R-suffix must be grounded in California's correctional

3   statutes or in CDCR regulations.

4          In Sandin v. O'Connor, 515 U.S. 472, 483-84 (1995), the Supreme Court held that a

5   state's correctional law creates a liberty interest if it "imposes atypical and significant hardship on

6   the inmate in relation to the ordinary incidents of prison life."  Sandin and its progeny identify

7   three factors to consider in determining whether an atypical and significant hardship exists:  (1)

8   whether the conditions "mirrored those conditions imposed . . . in analogous discretionary

9   confinement settings, namely administrative segregation and protective custody;" (2) the duration

10  and intensity of the conditions; and (3) whether the change in confinement would "inevitably

11  affect the duration of [the prisoner's] sentence."  Chappell v. Mandeville, 706 F.3d 1052, 1064

12  (9th Cir.2013) (citation omitted) (alteration in original).

13         If a state regulation creates a liberty interest in avoiding a particular decision or condition

14  of confinement, prison officials must provide a prisoner with a hearing on that decision plus:  (1)

15  written notice of the charges or allegations to be considered at the hearing; (2) a brief period after

16  notice, no less than twenty-four hours, to prepare for the hearing; (3) a written statement by the

17  fact-finder regarding the evidence and reasons for the finding; and (4) an opportunity to seek

18  assistance if the inmate is illiterate or the issues are complex.  Wolff v. McDonnell, 418 U.S. 539,

19  563-70 (1974).

20         In this case, the court need not consider whether the plaintiff had a liberty interest in not

21  being classified with the R-suffix, for even assuming he did, plaintiff has received all the process

22  due.

>           An inmate who has been convicted of a sex crime in a prior
>   adversarial setting, whether as the result of a bench trial, jury trial
>   or plea agreement, has received the minimum protections required
>   by due process.  Prison officials need do no more than notify such
>   an inmate that he has been classified as a sex offender because of
>   his prior conviction for a sex crime.

27  Neal, 131 F.3d at 831.  As explained in footnote 3 above, California courts questioned for some

28  time whether § 290 could be constitutionally applied to a person convicted of misdemeanor

1   indecent exposure.  However, there was no such question in 1977, when plaintiff pled guilty to

2   that violation, nor is there any such question now.  If the court were addressing plaintiff's due

3   process claim with that issue still unresolved, it might pause at the validity of plaintiff's 1977

4   conviction as "all the process due."  But the legality of plaintiff's conviction as a pre-requisite for

5   California's sex offender registry is now well settled in California law, and, according to the

6   Ninth Circuit in Neal, it is dispositive of his due process claim.  Pursuant to the decision in Neal,

7   plaintiff's plea of guilty to one count of misdemeanor indecent exposure met the minimum due

8   process protections required before prison officials classified him as a sex offender pursuant to

9   CDCR regulations and California Penal Code § 290.  See Washington v. Woodford, No. C 05-

10  2889 SI (PR), 2005 WL 3096116, at *3 (N.D. Cal. Nov. 14, 2005) ("[T]here was no due process

11  violation in adding to Washington's classification score the "R" suffix that indicated he had a sex

12  crime history. As the state habeas court noted, Washington did not dispute that he had the

13  requisite sex offense conviction. Washington's criminal case provided the procedural protections

14  necessary before the prison officials could label him as a sex offender. [¶] The fact that the "R"

15  suffix allegedly was not added to Washington's classification score within the time frame

16  provided by the state regulations does not make it a federal due process violation. A violation of

17  the state's regulation is not actionable under 42 U.S.C. § 1983.")  Plaintiff's claim that affixing

18  the R-suffix to his custodial classification violated his right to due process should therefore be

19  dismissed as to all defendants.

20                          B.   Plaintiff's equal protection claims

21          Plaintiff also alleges the defendants violated his right to equal protection under the

22  Fourteenth Amendment.  (See Complaint at ¶¶ 451, 453, 458, 461, 464, and 470.)  "The Equal

23  Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any

24  person within its jurisdiction the equal protection of the laws,' which is essentially a direction that

25  all persons similarly situated should be treated alike."  City of Cleburne v. Cleburne Living Ctr.,

26  473 U.S. 432, 439 (1985) (citation omitted).  Typically, "[t]o state a § 1983 claim for violation of

27  the Equal Protection Clause a plaintiff must show that the defendants acted with an intent or

28  purpose to discriminate against the plaintiff based upon membership in a protected class."

1    Thornton v. City of St. Helens, 425 F.3d 1158, 1166 (9th Cir. 2005) (internal quotation marks and

2    citations omitted).  A claimant may also attack a "facially neutral" regulation or policy under the

3    Equal Protection Clause, but "proof of its disproportionate impact on an identifiable group can

4    satisfy the intent requirement only if it tends to show that some invidious or discriminatory

5    purpose underlies the policy."  Lee v. City of Los Angeles, 250 F.3d 668, 686 (9th Cir. 2001)

6    (citations omitted).  Moreover, a regulation that purposefully affects a non-protected group

7    remains constitutional as long as it bears some rational relation to a governmental purpose.  Id. at

8    687.  Therefore a prison policy that treats a non-protected class of inmates differently from

9    similarly situated prisoners is constitutional if it is rationally related to legitimate correctional

10   goals.  Id.; Brignac v. Kimzey, No. CIV S-07-0624 GEB DAD P, 2009 WL 545991 at *3 (E.D.

11   Cal. Mar. 4, 2009) ("Moreover, prisoners incarcerated at different state prisons are not 'similarly

12   situated.'  The court is aware that state prisons vary based on security level, inmate population

13   and other factors.  The educational programming available at New Folsom may well be different

14   than what is available at other state prisons without violating the Equal Protection Clause.")

15        Plaintiff does not allege that his inclusion in a particular group, protected or non-

16   protected, motivated prison officials to treat him differently from other similarly situated

17   prisoners.  In fact, plaintiff's allegations of equal protection violations amount to no more than

18   due process claims of "atypical and significant hardship" alongside which plaintiff applies the

19   label "equal protection" for good measure.  (See Complaint at ¶¶ 451, 453, 458, 461, 464, and

20   470.)  However, plaintiff alleges no facts explaining how he was targeted for a discriminatory

21   purpose or even how his treatment differed adversely from that accorded other prisoners.  The

22   undersigned finds nothing in plaintiff's complaint that would, if true, support a cause of action for

23   violation of plaintiff's right to equal protection against any defendant.

24               C.  Plaintiff's retaliation claims

25        Plaintiff has alleged defendants Robinson, King and Jordan violated his rights under the

26   First Amendment when they used their recommendation of the R-suffix to retaliate against him

27   for the inmate grievance he filed several years earlier against Robinson.  (Compl. at ¶ 442.)  He

28   /////

1    incorporates by reference the same claim against defendants Jacquez, Fransham, Pulley,

2    Wilkinson, Marton and Olstrom.  (Id. at ¶¶ 450, 456, 460, 467 and 472.)

3          It is well established that a facially legitimate prison security measure, such as a change in

4    a prisoner's custody classification, may be actionable under the Civil Rights Act if it is carried out

5    in retaliation for the prisoner's decision to engage in constitutionally protected conduct.  See

6    Rizzo v. Dawson, 778 F.2d 527, 532 (9th Cir. 1995).  A plaintiff who claims a prison official

7    retaliated against him must show:  (1) that a state actor took some adverse action against him (2)

8    because of (3) the prisoner's protected conduct, and that such action (4) chilled the inmate's

9    exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate

10   correctional goal.  Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th Cir. 2005).

11         The burden is on the plaintiff to plead and prove the absence of any legitimate penological

12   purpose in the act that he alleges was retaliatory in nature.  See Pratt v. Rowland, 802, 806 (9th

13   Cir. 1995).  The Supreme Court has approved of requiring a plaintiff who alleges retaliation to

14   show that his exercise of constitutionally protected conduct was a "substantial factor" or

15   "motivating factor" behind the state actor's adverse action when that action appears on the

16   surface to be legally justified.  See Mt. Healthy City Bd. of Education v. Doyle, 429 U.S. 274,

17   287 (1977).

18         According to the allegations of his complaint, plaintiff first learned of Robinson's

19   intention to recommend the imposition of the R-suffix at a meeting with Robinson on January 27,

20   2009.  The complaint describes Robinson behaving at that meeting in a way that could suggest a

21   retaliatory motive, telling plaintiff that "[i]f you don't like it, appeal it, or file one of your little

22   complaints, you like to do that – right."  (Complaint at ¶ 86.)  Robinson's alleged intention

23   became manifest at the hearing of February 4, 2009, when he followed through with the

24   recommendation and continued to behave in a way suggesting personal animosity toward the

25   plaintiff.

26         The complaint alleges facts that, if proved, could be the basis of a claim for retaliation

27   against defendant Robinson – but only Robinson. Although plaintiff avers in conclusory fashion

28   some sort of collusion between Robinson and other defendants who were involved in his

1   classification process at CTF in 2009,[8] the complaint contains no facts supporting a reasonable

2   inference that any defendant besides Robinson was motivated to repay plaintiff for an inmate

3   grievance he filed against Robinson several years prior.  Plaintiff admits as much in his

4   opposition to the joint motion to dismiss, in which he argues "[t]here is only one reason that the

5   plaintiff thirty-seven years after suffering a <u>misdemeanor</u> conviction is <u>now</u> deemed to be a threat

6   to anyone; and that reason being <u>only</u> due to the <u>fact</u> that the plaintiff had the misfortune of <u>again</u>

7   crossing paths with defendant R. Robinson."  (Opposition (Doc. No. 40) at 26.)

8           Plaintiff has therefore failed to state a cognizable claim of retaliation against defendants

9   King, Jordan, Jacquez, Fransham, Pulley, Wilkinson, Marton and Olstrom.  Accordingly, their

10   motions to dismiss that claim should be granted.

11                    D.   <u>Plaintiff's Eighth Amendment claims</u>

12           Plaintiff makes blanket allegations against the defendants that their participation in the re-

13   classification process violated his right to be free from cruel and unusual punishment under the

14   Eighth Amendment.  (Compl. at ¶¶ 444, 454, 462, 466 and 471.)

15           The Eighth Amendment protects prisoners from inhumane conditions of confinement and

16   from the "wanton and unnecessary infliction of pain."  <u>Rhodes v. Chapman</u>, 452 U.S. 337, 347

17   (1981).  Inhumane conditions exist when a prisoner is deprived of the "minimal civilized measure

18   of life's necessities" – food, clothing, shelter, medical care and personal safety.  <u>Id.</u> at 347;

19   <u>Farmer v. Brennan</u>, 511 U.S. 825, 832 (1994).  "[A] prison official cannot be found liable under

20   the Eighth Amendment for denying an inmate humane conditions of confinement unless the

21   official knows of and disregards an excessive risk to inmate health or safety."  <u>Farmer</u>, 511 U.S.

22   at 837.  A plaintiff who claims that his conditions of confinement fall below the constitutional

23   standard must make two showings.  "First, the plaintiff must make an 'objective' showing that the

24   deprivation was 'sufficiently serious' to form the basis for an Eighth Amendment violation."

25   <u>Johnson v. Lewis</u>, 217 F.3d 726, 731 (9th Cir. 2000) (citation omitted).  "The Constitution . . .

26

27   _____

    [8] <u>See</u>, <u>e.g.</u>, Counts I and II of the complaint, in which plaintiff alleges that defendants Robinson,
    King and Jordan acted "individually and collectively" in retaliating against plaintiff for his
28   previously filed grievances.  (Compl. at ¶¶ 442-43.)

1   'does not mandate comfortable prisons, and only those deprivations denying 'the minimal

2   civilized measure of life's necessities' are sufficiently grave to form the basis of an Eighth

3   Amendment violation." Wilson v. Seiter, 501 U.S. 294, 298 (1991) (citations omitted).  Second,

4   the prisoner must make a "subjective" showing that prison officials "acted with the requisite

5   culpable intent such that the infliction of pain is 'unnecessary and wanton.'  In prison conditions

6   cases, prison officials act with the requisite culpable intent when they act with deliberate

7   indifference to the inmate's suffering."  Anderson v. County of Kern, 45 F.3d 1310, 1312 (9th

8   Cir.1995).

9          "Prison officials have a duty to take reasonable steps to protect inmates from physical

10   abuse."  Hoptowit v. Ray, 682 F.2d 1237, 1250-51 (9th Cir. 1982).  A violation of this duty

11   entails deliberate indifference to the inmate's safety – that is, a prison official must know of and

12   disregard an excessive risk to the inmate's safety.  Farmer, 511 U.S. at 837.  The very

13   obviousness of the risk may be sufficient to establish a defendant's knowledge.  Id. at 842; Wallis

14   v. Baldwin, 70 F.3d 1074, 1077 (9th Cir. 1995).  For example, the Ninth Circuit has held that

15   calling a prisoner a "snitch" in the presence of other inmates was sufficient to state a claim of

16   deliberate indifference to the inmate's safety as well as a claim of retaliation.  See

17   Vanlandingham v. Bojorquez, 866 F.2d 1135, 1138 (9th Cir. 1989).

18          In this case, the only allegation of plaintiff's complaint that plausibly satisfies the

19   objective element of an Eighth Amendment claim is the suggestion that the R-suffix puts plaintiff

20   in physical danger.  In Paragraph 212 of his complaint, plaintiff references the "'sex offender'

21   stigma" and his "fear for his safety should the information fall on the wrong ears."  In his

22   opposition to the pending motion to dismiss, plaintiff says "[i]t is no secret what the 'R' suffix

23   implications are, and what impact such a classification will have on a white male prisoner

24   incarcerated within the California state correctional system."  (Opposition (Doc. No. 40) at 50-

25   51.)  In his opposition plaintiff repeats the statement in his complaint that "[p]laintiff has, since

26   learning of the 'R' suffix attachment to his paperwork, been in extreme fear for his safety."  (Id.

27   at 51.)

28   /////

1      Courts have not ignored the potentially severe consequences of being known as a "sex

2   offender" in prison.  In <u>Neal</u>, the Ninth Circuit was blunt in acknowledging that "[w]e can hardly

3   conceive of a state's action bearing more 'stigmatizing consequences' than the labeling of a

4   prison inmate as a sex offender."  <u>Neal</u>, 131 F.3d at 829.  In <u>Neal</u> the court analyzed a due process

5   claim, but the seriousness of the "sex offender" label in prison is tangible enough to support, in

6   certain circumstances, a claim that a defendant used the dangerous implications of that label or

7   ignored them in deliberate indifference to an inmate's safety.  <u>See</u>, <u>e.g.</u>, <u>Knight v. Runnels</u>, No.

8   CIV S-07-0751-FCD-CMK-P, 2007 WL 2390139 at * 2 (E.D. Cal. Aug. 20, 2007) (finding both

9   prongs of a deliberate indifference claim were sufficiently pled where plaintiff "allege[d] that this

10  defendant put a 'R-suffix' in his file knowing that, if plaintiff was put in the general population,

11  he would be stabbed"); <u>Sims v. Woodford</u>, No. 1:05-cv-1523-LJO-DLB (PC), 2008 WL 669943

12  at *5 (E.D. Cal. Mar. 7, 2008) (denying a motion to dismiss under Rule 12(b)(6) where the

13  plaintiff had pled that "defendants errantly classified him as a convicted sex offender, and failed

14  to remove that classification subsequent to correspondence from the court to the contrary");

15  <u>Nailing v. Fosterer</u>, No. CIV S-09-2475-MCE-CMK, 2012 WL 1130655 at *8 (E.D. Cal. Mar. 2,

16  2012) (finding a cause of action sufficiently pled because "a reasonable jury could conclude that

17  defendants were deliberately indifferent to the generally known risk sex offenders face in the

18  prison general population").  Although in this case plaintiff's complaint is spare in detailing the

19  extent to which the R-suffix places him in danger of abuse by other inmates, at this stage of the

20  litigation the court must give the complaint a liberal reading and draw all inferences from it in the

21  plaintiff's favor.  Therefore the court finds that plaintiff has sufficiently pled the objective

22  element of his Eighth Amendment claim.

23      However, plaintiff's claim that defendants were deliberately indifferent to his safety – the

24  second, or subjective, element of an Eighth Amendment claim – is cognizable against defendant

25  Robinson only.  This determination follows from the court's conclusion, discussed above, that

26  plaintiff adequately pled his retaliation claim against Robinson only.  That is, it is plausible that

27  every defendant knew the danger an R-suffix could impose on the plaintiff, but only defendant

28  Robinson's alleged, retaliatory motive supplies the state of mind necessary to plead a claim of

1    deliberate indifference under the Eighth Amendment.  See Vanlandingham, 866 F.2d at 1138.

2    The allegations of the complaint do not support an inference that any defendant besides Robinson

3    participated in the re-classification process to retaliate against the plaintiff; therefore it does not

4    support an inference that any other defendant harbored the only state of mind that qualifies as

5    deliberate indifference in this case.

6          For these reasons, the undersigned concludes that plaintiff has failed to state a cognizable

7    Eighth Amendment claim against defendants King, Jordan, Jacquez, Fransham, Pulley,

8    Wilkinson, Marton and Olstrom.  Therefore, their motions to dismiss that claim should be

9    granted.

10         E.   Other federal claims

11         To the extent that the complaint contains other federal claims under the First, Eighth or

12   Fourteenth Amendments, they are too vaguely alleged to meet the federal rules' "demand [for]

13   more than an unadorned . . . accusation" that a defendant unlawfully injured the plaintiff.  Iqbal,

14   556 U.S. at 678; see also Fed. R. Civ. P. 8(a)(2) (requiring a federal complaint to present a "short

15   and plain statement" of the claim that entitle a plaintiff to relief).  Although plaintiff's allegations

16   of the Eighth and Fourteenth Amendment violations leave little space for speculation, the court

17   finds the joint defendants' expressed concern for loose ends under plaintiff's broad First

18   Amendment accusations is well taken.  Having carefully reviewed plaintiff's extraordinarily long,

19   wide-ranging complaint, the court finds only one outstanding claim: at various points in his

20   complaint, plaintiff references his First Amendment right to petition the government for redress

21   of grievances.  (See, e.g., Compl. at ¶¶ 457, 465 and 469.)

22         Prisoners have a First Amendment right to access to the courts.  See Lewis v. Casey, 518

23   U.S. 343, 346 (1996).  Prisoners have no freestanding right to a prison grievance process, see

24   Ramirez v. Galaza, 334 F.3d 850, 860 (9th Cir. 2003), but "a prisoner's fundamental right of

25   access to the courts hinges on his ability to access the prison grievance system."  Bradley v. Hall,

26   64 F.3d 1276, 1279 (9th Cir. 1995) overruled on other grounds by Shaw v. Murphy, 532 U.S.

27   223, 230 n. 2 (2001).  To state a viable claim that his right to access the courts has been violated,

28   a plaintiff must have suffered an "actual injury" by being shut out of court.  Christopher v.

23

1   Harbury, 536 U.S. 403, 415 (2002).  Therefore a correctional officer's active interference with an

2   inmate's appeal may be the basis of a claim under the First Amendment if that action disabled the

3   inmate from pursuing litigation in court.  See Navarro v. Herndon, No. 2:09-cv-1878 KJM KJN

4   P, 2012 WL 6097112 at *2 (E.D. Cal. Dec. 7, 2012).

5          In this case, plaintiff availed himself of the grievance process at least twice after he

6   learned that the R-suffix was part of his classification status.  The fact that plaintiff was denied

7   administrative relief on procedural bases with which he disagreed does not state a cognizable

8   claim that his access to the process itself was unconstitutionally foreclosed.  Furthermore, the

9   denials of plaintiff's inmate grievances, even if improper, have not shut his access to this court,

10  nor has plaintiff alleged they have.  Rather, plaintiff alleges only that some inmate appeals

11  coordinators were negligent or reckless in their attention to his inmate appeals or, at worst,

12  unlawfully motivated to deny them.  If defendants were to rely on an administrative denial of

13  plaintiff's inmate grievances to argue that he has not exhausted the inmate grievance procedure,

14  plaintiff could then attempt to show that a denial was improper and that he exhausted all

15  procedural avenues available to him.  The denial of the inmate grievance itself, however, does not

16  create an independent cause of action.  See Stockton v. Tyson, No. 1:10-cv-0662-BAM PC, 2011

17  WL 5118456 at *3 (E.D. Cal. Oct. 27, 2011) (dismissing a complaint on screening because

18  "[p]laintiff may not pursue a claim for denial of access to the courts . . . based on the rejection of

19  his appeals by staff"); Carroll v. Gricewich, No. 1:07-cv-0070-AWI-NEW (DLB) PC, 2007 WL

20  1345340 at *2 (E.D. Cal. May 8, 2007) (collecting cases).

21         For these reasons, the undersigned concludes that plaintiff has not stated a viable,

22  cognizable claim that his access to the courts has been violated.  To the extent plaintiff means to

23  allege any other federal claim under the First Amendment or any other constitutional provision,

24  such claims are too vaguely described in the complaint to be allowed to go forward.

25         F.   State law claims

26         Plaintiff has also alleged state law claims of negligence, fraud and infliction of emotional

27  distress.  However, in light of the court's conclusion that none of plaintiff's federal claims can

28  proceed, this court should decline to exercise supplemental jurisdiction under 28 U.S.C. §

                                                24

1367(c)(3) and dismiss plaintiff's state law claims without prejudice to his pursuing them in state court.

VI.   Conclusion

The court concludes that plaintiff has failed to state any viable claim under the 42 U.S.C. § 1983 against defendants Jordan, Marton, Pulley, Ostrom, Donnelly, Fransham, Jacquez, Wilkinson and King.  The motions to dismiss all federal claims pursuant to Rule 12(b)(6) brought on behalf of those defendants should be granted.

Plaintiff has, however, stated viable, cognizable claims for retaliation and deliberate indifference against defendant Robinson; he has failed to state viable claims against Robinson for violations of due process and equal protection.  However all of plaintiff's claims against Robinson are unexhausted.  Therefore defendant Robinson's motion for summary judgment due to plaintiff's failure to exhaust administrative remedies prior to filing suit as required should also be granted.

Accordingly, IT IS HEREBY RECOMMENDED that:

1.   The motion to dismiss filed by defendants Jordan, Marton, Pulley, Ostrom, Donnelly, Fransham, Jacquez and Wilkinson (Doc. No. 26) should be granted with prejudice as to all federal claims, for failure to state a claim on which relief could be granted.  Fed. R. Civ. P. 12(b)(6).  The motion to dismiss should be granted without prejudice as to all state law claims, pursuant to 28 U.S.C. § 1367(c)(3).

2.   The motion to dismiss filed by defendant King (Doc. No. 37) should be granted with prejudice as to all federal claims with prejudice, for failure to state a claim on which relief could be granted .  Fed. R. Civ. P. 12(b)(6).  The motion to dismiss should be granted without prejudice as to all state law claims, pursuant to 28 U.S.C. § 1367(c)(3).

3.  Defendant Robinson's motion for summary judgment (Doc. No. 53) should be granted as to all federal claims due to plaintiff's failure to exhaust administrative remedies prior to filing suit.

4.   Defendant Robinson's motion to dismiss should be granted in part and denied in part. It should be granted without prejudice as to all state law claims, pursuant to 28 U.S.C. §

1   1367(c)(3).  The motion to dismiss should be denied as moot as to all federal claims alleged

2   against defendant Robinson, in light of plaintiff's failure to exhaust administrative remedies prior

3   to filing suit as required.

4          These findings and recommendations are submitted to the United States District Judge

5   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

6   after being served with these findings and recommendations, any party may file written

7   objections with the court and serve a copy on all parties.  Such a document should be captioned

8   "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

9   objections shall be served and filed within fourteen days after service of the objections.  The

10  parties are advised that failure to file objections within the specified time may waive the right to

11  appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

12  Dated:  March 1, 2015

13

14  _____
    DALE A. DROZD
15  UNITED STATES MAGISTRATE JUDGE

16  hm
    john2400.57
17

18

19

20

21

22

23

24

25

26

27

28